## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

EDDIE WHITE,

        Plaintiff,

v.

CITY OF MIDDLETOWN,

        Defendant.

3:11-CV-00747 (CSH)

## RULINGS ON DEFENDANT'S MOTION TO STRIKE
## AND MOTION FOR SUMMARY JUDGMENT

**HAIGHT**, Senior District Judge:

      This is an employment discrimination case.  Plaintiff Eddie White brings this action against Defendant City of Middletown alleging claims of hostile work environment, race discrimination and retaliation.  Doc. [48].

      Specifically, Plaintiff's Amended Complaint contains the following counts:  (1) hostile work environment in violation of 42 U.S.C. § 1981 ("§ 1981"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq* ("Title VII"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60 *et seq* ("CFEPA"); (2) discrimination because of race in violation of the same; and (3) retaliation in violation of the same.[1]  *Id*.  Defendant denies all liability, and has moved for summary judgment.  Doc. [90].

      Defendant has also moved to strike three affidavits that Plaintiff has filed with his response to Defendant's motion for summary judgment.  Doc. [103].  This Ruling resolves both motions.

---

[1]Plaintiff also charged the Defendant with failure to promote in violation of § 1981, but has abandoned this claim.  Doc. [99] at 29, n. 1.

## I.  BACKGROUND

The following facts, for which there is some evidence in the record,  are recited in the light most favorable to Plaintiff, the non-moving party.

Plaintiff, who is African American, was employed in Defendant's Water and Sewer Department ("Department") from September1987 until his retirement in September 2013.  Doc. [90-4] at 1, 113.  Over the course of his employment, Plaintiff was promoted several times until reaching in February 2008 the position of Assistant Field Maintenance Manager.  Doc. [90-2] at ¶¶ 1-5.  As Assistant Field Maintenance Manager, Plaintiff reported directly to Tom Tetrault, the Field Manager.

Although initially they were on friendly terms, the working relationship between Plaintiff and Tetrault deteriorated soon after Plaintiff's appointment to Assistant Field Maintenance Manager into one marked by mutual disdain and recrimination.  Tetrault's frequent outbursts, in which he berated and cursed Plaintiff and other employees,  contributed in no small part to the breakdown of this relationship and discord within the Department.  By the summer of 2009, Tetrault's behavior had become so intolerable that Plaintiff and Devin Darley (the one other Assistant Field Maintenance Manager) brought their concerns about Tetrault to John Milardo, their union steward.[2]  Doc. [90-2] at 31;  Doc. [90-3] at 9-12.

Plaintiff and Darley expressed to Milardo their concerns about Tetrault's "behavior" and "outbursts," which included "derogatory remarks" directed at Plaintiff, Darley and others, and his

---

[2]Department employees were members of either the "blue collar union" called the American Federation of State, County and Municipal Employee Local 466 ("Local 466"), or members of the "managers and middle manager union," called Teamsters 671, (formerly the Middletown Managers & Professionals Association).  Doc. [90-2] at ¶ 16.  Plaintiff was a member of the latter.

habit of "calling people stupid and moron," "throwing stuff," "ranting and raving," and "belittling people constantly." Doc. [99-3] at 15. Although these were the first complaints of their kind about Tetrault brought formally by members of the union to Milardo, Tetrault's reputation had by this point preceded him. As Milardo put it, the description of Tetrault's behavior provided by Plaintiff and Darley was in keeping with reports Milardo "heard . . . around town that [Tetrault] was being a jerk." *Id*. Other individuals employed by Defendant, including Guy Russo, the Director of the Department, had also seen Tetrault express anger and raise his voice at other people in the work-place. Doc. 99-2 [65]; Doc. [99-11] at 5-6.

Attempting a reconciliation between the parties, Milardo held a meeting in his office on July 16, 2009, with Plaintiff, Darley and Tetrault. *See* Doc. [90-7] at 17. At the meeting, Milardo asked Tetrault bluntly: "'Is this, in fact, true, that you're throwing shovels across the road, that you're belittling people [and] calling them pieces of shit"? *Id.* at 23. When Milardo pressed Tetrault further about the allegations made by Plaintiff and Darley, Tetrault became upset and started yelling. Doc. [99-3] at 23, 26; Doc. [99-5] at 37-38. Eventually, Tetrault became incensed. Doc. [99-3] at 27. He told Milardo: "'You don't run my fucking department.'" *Id.* at 24. And, directing his anger squarely at Plaintiff, rose from his seat, pointed his finger at Plaintiff and called him a "'piece of shit'" and every other "expletive in the world." *Id.* at 25-26. The meeting ended with Tetrault flinging the office door open, yelling "'[f]uck you,'" and leaving. *Id*. at 25.

When Plaintiff entered Tetrault's office to retrieve a work assignment on the morning of the following day, July 17, 2009, Tetrault continued to curse Plaintiff and to act in an aggressive manner. Doc. [99-7] at 2. This outburst prompted Plaintiff to complain about Tetrault's behavior

to Defendant's Personnel Manager, Debra Milardo.[3]  That very day, Plaintiff submitted to Debra Milardo two written complaints that related separate instances of Tetrault's misconduct (collectively, "July 2009 complaints").  One written complaint related to Tetrault's "abusive treatment" toward Plaintiff on the morning of July 17, 2009; the other complaint related to a sexually explicit remark that Tetrault made about a female director employed by Defendant.  Doc. [48] at ¶ 18; Doc. [99-6] at 2; Doc. [99-7] at 1-2.  Incidentally, the female director about whom Tetrault made that remark was Debra Milardo.  Doc. [99-7] at 1.

When Plaintiff submitted to Debra Milardo these two written complaints, he also verbally conveyed to her his belief that he was generally the "subject of harassment by . . . Tetrault."  Doc. [99-11] at 2.  He described "specific instances where . . . Tetrault [had] belittled [and] berated [him], used offensive language, [and] demeaned and threatened" Plaintiff and other members of the Department.  *Id.*  Plaintiff at this time also verbally conveyed to Debra Milardo his belief that he was being mistreated because of race.  Doc. [99-4] at 59. Based on the July 2009 complaints, Debra Milardo immediately stripped Tetrault of supervisory authority pending the outcome of an investigation to determine the veracity of Plaintiff's allegations.  The investigation into Tetrault's misconduct was conducted pursuant to Defendant's "zero tolerance policy," (hereinafter, "zero tolerance investigation") which prohibits inappropriate behavior and discrimination in the workplace.  Docs. [99-8]; [99-10]; [99-27] at 2-3.

In the course of the zero tolerance investigation, Debra Milardo interviewed three individuals who overheard Tetrault's sexually explicit remark recounted in Plaintiff's first written complaint.  All three witnesses corroborated Plaintiff's allegation that the remark was made.  Doc.

---

[3]Debra Milardo is the wife of John Milardo.  Doc. [99-3] at 14.

[99-11] at 4.  Based on those reports, Debra Milardo concluded that Plaintiff's complaint concerning the sexually explicit remark made by Tetrault was sufficiently substantiated.  *Id.*

In addition to her investigation regarding Tetrault's sexually explicit remark, Debra Milardo interviewed 27 witnesses about Plaintiff's general allegations concerning Tetrault's harassment of Plaintiff and treatment of Department workers.  Debra Milardo concluded that 25 of the 27 witnesses "supported [Plaintiff's] claims."  Those witnesses confirmed Tetrault's regular use of "over the top language," his "fits of rage [and] screaming," and his practice of "throwing . . . equipment . . . or other property."  The witnesses also, by and large, reported that "Tetrault makes them feel small," "has control issues," "is [constantly] yelling" and "ridicules" those under his supervision.  The workers described Tetrault as: "self-centered, demeaning, intimidating, arrogant, heavy handed, abrasive, offensive . . . unprofessional, [and] very hot headed."  They conveyed their belief that Tetrault contributed to "low morale," "manage[d] to complicate every job," and that more work generally was accomplished "without . . . Tetrault on the jobsite."  *Id.* at 5-6.  These witness also confirmed Tetrault's "frequent verbal attacks of [Plaintiff]" and identified specific instances where Tetrault directed outbursts at Plaintiff.  Doc. [99-11] at 5.

Debra Milardo credited the testimony of the 25 workers who supported Plaintiff's claims and concluded that Tetrault's behavior was a violation of proscriptions set forth in Defendant's zero tolerance policy and the City of Middletown Personnel Rules.[4]  *Id.* at 8.  In reaching this conclusion,

---

[4]According to Debra Milardo, Section 1 (c) of the City of Middletown Personnel Rules requires employees to "'treat[] all visitors, fellow employees and all others in a courteous manner,'" and section 2 (h) prohibits "'[t]hreatening or intimidating supervisors or fellow workers, or members of the general public.'"  Doc. [99-12] at 7 (citing City of Middletown Personnel Rules, Behavior of Employees Policy).  The Zero Tolerance Policy also prohibits "inappropriate behavior in the workplace."  Doc. [99-27] at 2.

however, Debra Milardo determined that the "evidence does *not* support [a finding] that the violations were based upon the race of [Plaintiff]." *Id.* (emphasis added). That finding notwithstanding, Debra Milardo recommended that Tetrault should be disciplined for violating Defendant's policies prohibiting inappropriate behavior. Doc. [99-12] at 8-9. In accordance with her recommendation, Defendant suspended Tetrault for ten days and mandated that he complete sexual harassment and supervisory training. Doc. [99-12] at 19.

After Tetrault returned from his suspension on November 30, 2009, he told Plaintiff that "he was going to get back at the people that caused him to be suspended, including [Plaintiff]." Doc. [99-6] at 3; Doc. [99-12] at 19. Plaintiff contends that thereafter, Department management, including Tetrault and Russo, "almost immediately" began retaliating against him. Doc. [99] at 7. From Plaintiff's perspective the retaliation manifested as "nitpicking," "putting him under a microscope," "questioning every little move [he made]" but "not doing it to anybody else." Doc. [99-3] at 32. Plaintiff also contends that he was experiencing problems with "vacation days not being approved, on-call time being eliminated, [and complaints from management concerning certain] missing documents." Doc. [99-4] at 101.

One of most significant examples of retaliation from Plaintiff's perspective was the Department's decision to assign to him a disproportionate amount of the work related to the testing of certain "backflow prevention assemblies" (hereinafter "back flow testing").[5] When Plaintiff began falling behind on this work, Tetrault urged Russo to discipline Plaintiff. On August 21, 2009,

---

[5]Backflow prevention assemblies are mechanical devices installed on water service lines (or at plumbing fixtures) to prevent backflow of contaminants into drinking water through cross connections. State drinking water rules required Defendant to test regularly the backflow prevention assemblies in order to ensure that they are in working order. Doc. [90-2] at ¶ 62.

6

approximately one month after Plaintiff filed the written complaints against Tetrault, Tetrault sent an email to Russo requesting that Russo "ask [Plaintiff] for all completed backflow test[s] and inspections." Doc. [99-13]. Tetrault also indicated that he "asked [Plaintiff] for completed form[s] on several occasions" to no avail, and, also expressed in that email his belief that the Department was "falling behind" on the back flow testing. Doc. [99-13]. On October 23, 2009, Tetrault sent another email to Russo in which he noted that many backflow tests had not been completed and expressed concern that the Department was "in danger of being out of compliance" with state regulations pertaining to backflow testing. Doc. [99-14] at 2. Tetrault reminded Russo in that email that he had spoken to Robert Young (the Deputy Director) and Russo "on several occasions about this work not being done and [Plaintiff's] lack of cooperation" on that score. *Id.* Tetrault also conveyed to Russo in that email that "no test or inspections [had] been completed since July 17th," which was the date that Plaintiff lodged the written complaints against Tetrault. *Id.*

Around the time Tetrault communicated concerns about Plaintiff's completion of the backflow testing, Debra Milardo expressed her suspicion that Plaintiff was being retaliated against for filing the written complaints against Tetrault. In an email to Russo dated August 24, 2009, Debra Milardo stated that she was "in receipt" of Tetrault's August 21, 2009 email to Russo regarding Plaintiff's non-compliance with the backflow testing program. Debra Milardo stated that she was "at a loss [with respect to] how the [D]epartment expects [one] person to complete the assignment ([Plaintiff]), while also being a site supervisor." Doc. [99-15] at 2. Noting in her email to Russo that the zero tolerance investigation was underway, Debra Milardo also stated "I am concerned that retaliation is an issue before the matter has even concluded." *Id.* She directed Russo to contact her to "ensure that retaliation does in fact not happened." *Id.*

7

In spite of Debra Milardo's concerns, by the spring of 2010 Russo and Tetrault were still assigning the majority of the work related to backflow testing to Plaintiff. As John Milardo pointed out in emails dated May 26, 2010, to Russo and Faith Jackson, a director in Defendant's personnel department, the assignment of backflow testing to Plaintiff was particularly problematic because work of that nature had been historically completed by members of Local 466, the "blue collar union," to which middle managers like Plaintiff did not belong. Doc. [99-16] at 4-5. John Milardo feared that Defendant might be "exposing [itself] to litigation" based on the assignment of the backflow work to one other than a Local 466 member and what he viewed as "a pattern concerning the supervision of [Plaintiff]." *Id.* at 5-6. He expressed this concern directly to Russo in one of his May 26, 2010 emails. *Id*. At this time, Debra Milardo again inquired of Russo why Plaintiff was given the backflow testing assignment, and reiterated her concern that this was more work than one person could handle. As she put it: "[Plaintiff] cannot accomplish his daily work load AND be the sole responder to backflows." *Id.* at 3. Despite the efforts of Debra Milardo and John Milardo, management at the Department, including Russo and Tetrault, continued to require Plaintiff to complete the majority of the backflow testing work. From the perspective of the Milardos, retaliation against Plaintiff was in keeping with the Department's regular practice of taking adverse employment actions against those who had filed workplace grievances. Doc. [99-3] at 32; Doc. [99-4] at 37-39, 48.

By June 2010, what Plaintiff perceived as Defendant's retaliatory conduct had caused him such a great deal of emotional distress that it was necessary at that time for him to take a medical leave of absence. Doc. [99] at 11-12. Plaintiff around this time also filed a complaint with the State of Connecticut Commission on Human Rights and Opportunities ("CHRO"). In this complaint dated

June 24, 2010 ("June 2010 CHRO complaint"), Plaintiff alleged that he had been "subjected to an ongoing and escalating course of harassment and discrimination based on [his] race." Doc. [99-22] at 3. He also claimed that Tetrault was "berating and swearing" at him, and that he was being "treated differently" by other members of the Department including Russo and Young. *Id.* at 2-3. Plaintiff charged Defendant with claims of harassment, discrimination and retaliation in violation of CFEPA and Title VII. *Id.* at 4-5.

On July 27, 2010, Plaintiff returned from his medical leave of absence on a half-day basis until October 18, 2010. Upon his return, Plaintiff learned that none of his work had been completed in his absence. Doc. [99-29] at 4. Although he was working only part time at this point, Tetrault still required Plaintiff to complete the backflow testing, and to do so without any assistance. *Id.* When Plaintiff began falling behind on the backflow testing, Tetrault again sent emails to Russo complaining of Plaintiff's failure in this regard. *Id.* It was not September 14, 2010, that the Department began splitting the backflow testing responsibility with Plaintiff and another worker. *Id.* This additional help notwithstanding, Plaintiff took a second medical leave beginning on November 10, 2010. Reports provided around this time to Debra Milardo from the Plaintiff's therapist, who he had started seeing for "stress caused by . . . ongoing discrimination and harassment," indicated that Plaintiff "had reached a point of being suicidal." Doc. [99-4] at 135; Doc. [99-29] at 3.

Between the end of 2010 and the beginning of 2011, Tetrault filed at least two complaints with Defendant's personnel department against Plaintiff or other Department employees. Doc. [99-5] at 150. The first complaint, filed in September 2010 ("September 2010 complaint") concerned an incident that occurred on September 22, 2010, in which Tetrault complained, *inter alia*, that

Plaintiff "stuck his chest out" at him in a confrontational manner.  Doc. [99-28] at 1-3; Doc. [99-29] at ¶ 18.  Tetrault also complained that Plaintiff was regularly "pull[ing] [workers] aside" after Tetrault passed out work assignments, which presumably left Tetrault with the impression that Plaintiff was undermining his authority.  Jackson, who was tasked with investigating this complaint, concluded that "there was no wrong doing" and that no violation of any workplace policy had occurred.  Doc. [99-28] at 3.

On January 11, 2011, Tetrault filed a second complaint against Plaintiff and other Department employees ("January 2011 complaint").  He alleged, *inter alia*, that Plaintiff "filed a CHRO complaint against [him] even though he knew the allegations contained therein were false"[6]; that Plaintiff "yelled at [him]" and "acted in a hostile manner that made [Tetrault] concerned about [his] physical welfare"; and that Plaintiff "altered . . . work orders . . . [Tetrault] issued him."  Doc. [99-26] at 5.  Tetrault also charged Plaintiff, Darley and other members of the Department with all manner of recalcitrant behavior.  *Id.* at 5-7.  Toward this end, Tetrault alleged that a "hostile work environment [had] been allowed to develop," which had "undermined" his "ability to manage [his] crews as set out in [his] job description."  *Id.* at 6-7.  Defendant was investigating Tetrault's January 11, 2011 complaint by the time this action was filed, but there is no evidence that Defendant made a formal determination concerning the veracity of this complaint or if disciplinary action was taken against Plaintiff or others.  Doc. [99-28] at 23.

Not one month after Tetrault submitted his January 2011 complaint, Plaintiff filed a second CHRO complaint dated February 4, 2011 ("February 2011 CHRO complaint"), where he again

---

[6]Tetrault attached Plaintiff's June 2010 CHRO complaint to his January 2011 complaint in support of his allegation that Plaintiff had filed a "false" CHRO complaint against him.  Doc. [ 99-26] at 12-16.

charged Defendant with claims of harassment, discrimination and retaliation in violation of CFEPA and Title VII.  In support  of those charges, Plaintiff alleged that since filing his first CHRO complaint, he "had been subjected to open and overt acts of discrimination and harassment by . . . Tetrault on a regular basis."  Doc. [99-29] at 4.  Plaintiff cited Tetrault's two complaints against him in the preceding months as evidence of harassment.  He alleged that as a result of Tetrault's September 2010 complaint, he was "subjected to an interrogation about the incident," and referred to the January 2010 complaint as a "hostile act."  *Id.* at 4-5.

Plaintiff avers that when he returned to work in May 2011, the Department renewed its "campaigned of retaliation against him."  Doc. [99] at 14.  That retaliation from Plaintiff's perspective included, most notably, Russo filing two complaints against him.  Both complaints related to what Russo perceived as Plaintiff's insubordination.  The first complaint, dated June 22, 2011 ("June 2011 complaint"), was related to an argument involving Plaintiff, Russo and Tetrault over employee vacation schedules.  Russo complained that during this argument, Plaintiff "raised his voice" to him and Tetrault "in an argumentative manner," and that Plaintiff was "yelling and swearing."  Doc. [99-30] at 3; Doc. [99-32] at 2.  Debra Milardo, who investigated the complaint, concluded that the allegation of "yelling and swearing" was not supported and that there was no violation of Defendant's zero tolerance policy.  Doc. [99-32] at 2; Doc. [99-4] at 153-155.

In Russo's second complaint against Plaintiff, dated August 10, 2011 ("August 2011 complaint"), Russo complained that Plaintiff disobeyed his directive to issue work assignments to the Department staff.  Citing direction he had received from his union, Plaintiff indicated to Russo that he would not issue work assignments unless he had received written instructions from Tetrault.  Doc. [99-31] at 3.  This complaint does not appear to have risen to the level of a violation of

Defendant's zero tolerance policy or resulted in disciplinary action against Plaintiff.  Doc. [99-2] at 157-158.

In November 2011, Russo sent an memorandum to the Mayor's office indicating that Plaintiff had failed to obtain a State Class III Distribution Operator's License ("state operator's license").  Doc. [99-4] at 151-152.   When Plaintiff was appointed to the position of Assistant Field Maintenance Manager roughly three and a half years prior, a condition of that promotion was that he obtain the state operator's license within two years of his appointment.  Doc. [90-1] at 8.  Although Plaintiff was given initial extensions of time in which to complete that requirement, the Mayor's office refused to grant Plaintiff additional time at this later stage.  Doc. [90-4] Ex. L; Doc. [99-3] at 65-66.   Plaintiff was subsequently demoted to the position of "Utility Worker III" in January 2012.  Plaintiff retired from the Department in September of the following year.  Doc. [90-4] Ex. M.

Thereafter, Plaintiff filed the instant dispute against Defendant.  As indicated above, he alleges in his Amended Complaint claims of hostile work environment, race discrimination and retaliation, each in violation of § 1981, Title VII, and CFEPA.

## II.  MOTION TO STRIKE

The Court first considers Defendant's motion to strike before addressing the merits of its motion for summary judgment.  Defendant moves to strike the affidavits of Rick Miano, Danny Barone and Tami Kapacziewski (all of whom were employed by the Department) on grounds that none of these individuals were listed in Plaintiff's initial disclosures pursuant to Fed. R. Civ. P. 26 (a), or thereafter identified in supplementary disclosures pursuant to Fed. R. Civ. R. 26 (e).  As Defendant points out, Plaintiff never served his initial disclosures as required by Rule 26 (a)(1).

12

Rule 26 (a)(1)(A) requires a party to disclose the names of "each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 37 (c)(1) provides in relevant part: "If a party fails to provide information . . . as required by Rule 26 (a) or (e), the party is not allowed to use that information on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless."  Substantially justified means "justification to a degree that could satisfy a reasonable person that the parties could differ as to whether the party was required to comply with the disclosure request." *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002).  "Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to the disclosure." *Id.* (internal quotation marks omitted).  "The burden to prove substantial justification or harmlessness rests with the dilatory party." *Id.*  Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37 (c)(1) is a drastic remedy and should be exercised with caution.  *Ventra* v. *United States,* 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000).

In his sworn affidavit filed in response to Defendant's motion, Plaintiff's counsel states that "[w]hen discovery commenced in this case in [the spring of] 2011, Plaintiff's counsel did not know about Mr. Miano, Mr. Barone, or Ms. Kapacziewski, or that they may be used as witnesses in support of Plaintiff's claims." Doc. [113-1] at ¶ 4.  Consequently, at the time Plaintiff was required to serve his initial disclosures pursuant to Rule 26 (a), not only did his counsel not know that these individuals may be used in support of his client's claims, he did not even know of their identity.  It was not until discovery commenced that Plaintiff's counsel learned that Kapacziewski had filed her own internal complaint against Tetrault.  And it was not until thereafter, in December 2012 when Plaintiff's counsel received audio recordings of those interviewed by Debra Milardo in connection

with her zero tolerance investigation of Plaintiff's July 2009 complaint, that Plaintiff's counsel "first became aware of the identity of . . . Mr. Miano and Mr. Barone." *Id.* at 7. This revelation in the later stages of discovery was engendered to some extent by Defendant, which in response to Plaintiff's interrogatories served in August 2011, failed to identify Miano, Barone and Kapacziewski as individuals who had participated as "witnesses[es] or otherwise" in "investigations . . . into . . . Tetrault's conduct." Doc. [113] at 6. Given that it was not until later in discovery that Plaintiff learned that Miano, Barone and Kapacziewski may have had information in support of his claim, his failure to disclose these individuals in a Rule 26 (a) disclosure was excusable.

Under Fed. R. Civ. R. 26 (e)(1) Plaintiff nevertheless had a continuing duty to "supplement or correct its disclosure." *Id.* However, this obligation is triggered only if "the party learns that in some material respect the disclosure . . . is incomplete . . . *and if the additional . . . information has not otherwise been made known to the other parties during the discovery process or in writing*." *Id.* (emphasis added). Consequently, "there is no need as a matter of form to submit a supplemental disclosure to include information *already revealed by a witness in a deposition or otherwise through formal discovery*." *BanxCorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 323 (S.D.N.Y. 2013) (quotation marks omitted) (emphasis added); *see also Sealy v. Gruntal & Co.,* No. 94 cv 7948 (MHD), 1998 WL 698257 at *2 (S.D.N.Y. Oct. 7, 1998) ("Since the identities of seven of these individuals were disclosed in deposition testimony, together with at least some information about their potential significance, plaintiff cannot demonstrate a clear-cut violation of [Rule 26] with respect to them.").

Where, as here, a party knew of the witnesses and the information they possessed, the duty to supplement disclosure under Rule 26 (e) does not apply. As indicated in the audio recordings

14

*supplied to Plaintiff by Defendant*, Miano and Barone were interviewed by Debra Milardo in connection with her zero tolerance investigation of Plaintiff's complaints against Tetrault.  Doc. [113-1] at ¶ 7.  Further, in the depositions of Debra Milardo, Jackson and Russo, each testified regarding the complaint Kapacziewski had filed against Tetrault, as well as Miano's concern, set forth in his affidavit, that he himself, was the subject of retaliation.  Doc. [113-7] at 110-116, 149-153; Doc. [113–8] at 13-14, 30-40, 157-158; Doc. [113-9] at 38, 50-52, 64, 67-68, 113, 117.  Not only had Plaintiff no obligation under Rule 26 (e) in this instance, Defendant's contention that it was "surprise[d] . . with new witnesses" strains credulity.  Doc. [103-1] at 5.  Defendant should have anticipated that Plaintiff would have relied on information *it provided to Plaintiff* in discovery, especially information supplied by those individuals who were interviewed by Defendant's Personnel Director in connection with Tetrault's misconduct or who had filed a written workplace complaint against him.

This is not a close call.  Defendant's motion to strike is denied.  The Court will rely on the affidavits of Miano, Barone and Kapacziewski to the extent they are relevant to Defendant's motion for summary judgment.

### III.   MOTION FOR SUMMARY JUDGMENT

### A.   Summary Judgment Legal Standard

The standards for summary judgment are familiar.  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  The role of a district court in considering a motion for summary judgment is therefore "not to resolve disputed questions of fact but only to determine whether, as to any material issue,

15

a genuine factual dispute exists." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). A party moving for summary judgment bears the burden, on the claims made within that motion, of showing that it is entitled to summary judgment. Once it has satisfied this burden, the party opposing that particular summary judgment motion "must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir 2009) (internal quotation marks omitted). A dispute about a genuine issue of fact exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In making its determination on a summary judgment motion, a trial court will resolve all ambiguities and draw all inferences contained within that motion in favor of the party against whom summary judgment is sought. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 274 (2d Cir. 2009). It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). When "a motion for summary judgment is properly supported by documentary and testimonial evidence . . . the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of fact." *Marczeski v. Gavitt*, 354 F.Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)). In order to present a "genuine issue of material fact" the party opposing a particular motion for summary judgment must therefore present contradictory evidence "such that a reasonable jury could return a verdict for [that] party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. Consequently that party must present affirmative evidence in order to defeat a properly supported

summary judgment motion.  As the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *id.* at 247-48, if the party opposing a particular summary judgment motion submits evidence that is "merely colorable," summary judgment may be granted.  *Id.* at 249-50.  In sum, a "complete failure of proof concerning an essential element of [that] party's case necessarily renders all other facts immaterial." *Celotex Corp. v.  Catrett,* 477 U.S. at 322.

In general "when ruling on a motion for summary judgment in an employment discrimination case, where intent is at issue, the Court "affirms judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). However, as the Second Circuit has noted, "it is . . . beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," as the "salutary purposes of summary judgment —  avoiding protracted, expensive and harassing trials —  apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (citation omitted).  Ultimately, then, "[t]rial courts should not treat discrimination differently from other ultimate questions of fact," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000), and "[s]ummary judgment against a plaintiff in an employment discrimination case is appropriate if the plaintiff offers only unsupported assertions, conjecture or surmise, or conclusory statements to support an essential element of her case." *Soderberg v. Gunther Intern., Ltd.*, No. 02 cv 02010, 2004 WL 57380 at *4 (D. Conn. January 7, 2004) (internal quotation marks and citation omitted).

Here, Defendant has filed a motion for summary judgment dismissing Plaintiff's claims of

hostile work environment, retaliation and discrimination.  I address the motion as it pertains to those claims in that order.

**B.**    **Hostile Work Environment under § 1981, Title VII and CFEPA**

Plaintiff first seeks relief under § 1981, Title VII and CFEPA for a hostile work environment created by the cumulative effect of the incidents over the course of his employment recounted above. To prevail on hostile work environment claim a "plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365 (2d Cir. 2002); *see also Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir. 1998); *Tomika v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995).[7]

The Supreme Court has instructed that a court should look to all of the circumstances collectively to determine whether a hostile work environment exists, as set forth in a non-exhaustive list of factors that should be considered, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with the employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n. 1 (1998).  Race-based comments of sufficient "quantity, frequency and severity" can support the inference that a plaintiff was subjected to a hostile work environment because of his

---

[7]The standard for showing a hostile work environment under § 1981, Title VII and CFEPA are essentially the same.  *See Summa v. Hofstra Univ.,* 708 F.3d 115, 124 (2d Cir.2013) (Title VII); *Fincher v. Depository Trust & Cleaning Corp.*, 604 F.3d 712, 723-24 (2d Cir.2010) (§ 1981); *Brittell v. Dep't of Correction*, 247 Conn. 148, 167 (1998) (CFEPA).

race. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks omitted). For racist comments, slurs and jokes to constitute a hostile work environment, there must be "more than a few isolated incidents of racial enmity," *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986), meaning that "[i]nstead of sporadic racial slurs, there must be a steady barrage or opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d at 110 (internal quotation marks omitted). However, the mere fact that a plaintiff was "not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim." *Id.* at 111. The issue is not whether the plaintiff "had notice of the harassment . . . but whether there was a pervasive hostile work environment." *Perry v. Ethan Allen*, *Inc.*, 115 F.3d 143, 151 (2d Cir. 1997).

Proving a hostile work environment claim "involves showing both 'objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004) (quoting *Harris v. Forklift Systems*, 510 U.S. at 21).

In addition, a plaintiff must demonstrate that the conduct occurred because of his membership in a protected class. *See Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999). However, where, as here, a plaintiff must establish that the conduct occurred *because of his race*, "[f]acially neutral incidents may" nevertheless "be included . . . among the 'totality of the circumstances' that the courts consider in any hostile work environment claim, so long as . . . [there is] some circumstantial or other basis for inferring that incidents [race] neutral on their face were in fact discriminatory." *Alfrano v. Costello*, 294 F.3d at 378. Thus, race neutral "adverse

19

personnel actions" alleged by Plaintiff in this case may be actionable for purposes of a hostile work environment claim if buffeted with circumstantial evidence supporting the inference that the conduct was motivated by racial animus.

Applying these standards to the facts of this case, there is no genuine or reasonable doubt that *Plaintiff perceived* the Department's conduct as sufficiently severe and pervasive to create an abusive work environment.  What Plaintiff termed "stress caused by . . . ongoing discrimination and harassment" was so overwhelming that, according to his therapist, he "had reached the point of being suicidal."  Doc. [99-4] at 135; Doc. [99-29] at 3.  At times, he became unable to do his job altogether.  He took *two* medical leaves of absence followed thereafter by stretches of employment where he worked only on a part time basis.  The import of this evidence is that not only did Plaintiff *subjectively perceive his work environment to be hostile or abusive*, the harassment was so severe from his perspective that it *interfered with his work performance*.

The remaining questions for this Court to consider, are, in the first instance, whether Plaintiff's work environment was *objectively* hostile or abusive, and, in the second instance, whether Plaintiff was subjected to a hostile or abusive work environment *because of his race*.  As to the first element, the record indicates that in Tetrault, the Department employed an upper level manager of uncommon intemperance.  When Debra Milardo investigated Plaintiff's claims against Tetrault of harassment and misconduct, *25 of 27 witnesses*— an almost universal consensus— supported Plaintiff's claims.  Doc. [99-12] at 4.  In the course of her investigation, Debra Milardo learned that Tetrault was regularly acting in an aggressive and intimidating manner toward those under his supervision.  Some of the language regularly used by Tetrault in the context of communicating with Department employees, included: "I hate stupid people"; "What the fuck are you doing!"; "Do I have

20

to babysit you?"; "Are you a fucking moron?"; "If you are scared to do your job then go the fuck home"; "You are all worthless pieces of shit"; "You do not know what the fuck you are doing" and "Are you an idiot?"  Needless to say, the record supplies the inference that Tetrault's behavior on a not infrequent basis was altogether reprehensible.  As an upper level manager within the Department, his conduct would have contributed significantly to a hostile or abusive work environment.

Apart from Tetrault's outbursts directed at those under his supervision, the record  indicates a culture of retaliation within the Department.  John Milardo likened the retaliation Plaintiff experienced, after he complained of Tetrault's behavior, to the "Mike Gerini and Vecchitto situation," Department employees who were presumably subject to "nitpicking" and heightened scrutiny after filing work-place complaints.  Doc. [99-3] at 32.  Debra Milardo indicated that like Plaintiff,  "Mr. Darley," "Mr. Benzi," "Mr. Miano," and "Mr. Stefurak" were subject to "negative" "disciplinary action" or "change in job assignments" after filing "complaints or grievances" against the Department management.  Doc. [99-4] at 38.  According to Debra Milardo, Stefurak, who suffered from gout, was given "all-day walking" assignments as punishment for supplying information to Debra Milardo in connection with her investigation of Plaintiff's July 2009 complaints against Tetrault.  *Id.* at 48.  Based on the evidence that not less than six employees (not including Plaintiff) experienced retaliation after filing complaints, and Tetrault's well documented offensive conduct, the Court concludes that there is a genuine issue of material fact as to whether the work environment within the Department was objectively hostile or abusive.

The record also reveals that several race-based comments were made to Plaintiff, or about him, during the course of his employment.  After Plaintiff filed his June 2010 CHRO complaint,

Terault said to him "you aren't hung like a real black man." Doc. [99-23] at 3; Doc. [99-24] at 3; *see also* Doc. [90-3] at 79-80.  Plaintiff understood this comment as meaning that he was not a real black man because he was neither "[h]ung in a tree" nor "well-endowed."  Doc. [90-3] at 80.  Plaintiff claimed that on a separate occasion, when he raised to Tetrault his suspicion that Russo and Young "don't like [him]. . . don't like . . . minorities," Tetrault responded, "you have no idea."  Doc. [90-2] at ¶ 97, Doc. [90-3] at 83.  Miano also reported one incident where Tetrault said to him, "'[Plaintiff] only got the job'"— then "made a gesture of rubbing the skin on his arm," as if to indicate that Plaintiff was only given his position because of his race.  Doc. [99-23] at 2.  On another occasion, Plaintiff claims that his former supervisor, Peter Poissant, was verbally reprimanded after calling him a "nigger" in November 2007.  Doc. [90-2] at ¶¶ 38-39, 86.

Apart from these specific remarks, others close to the Department expressed concern that Plaintiff was being mistreated because of his race.  John Milardo believed that it "became a race issue" when management within the Department began "writing up" Plaintiff for falling behind on the backflow testing work, but not "the white guy," Darley, who was "responsible for exactly the same thing."  Doc. [99-3] at 50-51.  In light of Tertault and Russo's complaints, Debra Milardo also had "concern" as to "whether or not" there was an "issue" concerning a "violation of [Plainitff's] rights under a protected class."  Doc. [99-4] at 33.  After Plaintiff filed his June 2010 CHRO complaint, Kapaczieski claimed that she "saw" Tetrault and Russo "individually or together, follow [Plaintiff] to see what [Plaintiff] was doing on the job" and expressed her opinion that other members of the Department "were not followed or monitored with such consistent scrutiny."  Doc. [99-25] at 2.  Kapacziewski, Barone and Miano all expressed a belief that Plaintiff was being harassed or discriminated against by Tetrault or other members of the Department.  Doc. [99-23] at

1; Doc. [99-24] at 1; Doc. [99-25] at 1.

Although the race-based comments on this record made to Plaintiff, or about him, are relatively few in number, the internal complaints filed against Plaintiff, the arduous work he was assigned, his eventual inability to perform that work, and the concern of others that he may have been discriminated against because of his race, prevents this Court from dismissing those comments out of hand. Conversely, those race-based comments supply the inference that facially race-neutral adverse employment actions against Plaintiff were motivated by racial animus. Thus, under the totality of the circumstances, the Court finds that a reasonable person could conclude that Plaintiff was subject to a hostile work environment. Accordingly, Defendant's motion for summary judgment dismissing Plaintiff's hostile work environment claims will be denied.

## C.      Retaliation under § 1981, Title VII and CFEPA

Plaintiff next claims that he was subject to unlawful retaliation in violation § 1981, Title VII and CFEPA. Title VII prohibits employment discrimination against "any individual" because of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A separate section of Title VII, which contains its antiretaliation provision, prohibits employers from discriminating against an employee who "has opposed any practice made an unlawful employment practice" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." § 2000e-3(a). *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). CFEPA and § 1981, under which Plaintiff also asserts claims, have also been held to encompass claims of retaliation. *See CBOCS West, Inc., v. Humphries*, 553 U.S. 442 (2008) (§ 1981); *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 108 (1996) (CFEPA).

The Court applies the burden-shifting analysis set forth in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-803 (1973), to evaluate Plaintiff's claims of retaliation (brought under all three statutes) for summary judgment purposes. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) ("Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden-shifting analysis."); *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. at 108 (applying *McDonnell Douglas* standard to CFEPA). First, a plaintiff must establish a *prima facie* case of retaliation by showing: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa v. Hofstra Univ.,* 708 F.3d 115, 125 (2d Cir.2013) (internal quotation marks omitted). A plaintiff's burden in this regard is "*de minimis*," and the "court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrant Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Once a *prima facie* case of retaliation is established, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory." *Fincher*, 604 F.3d at 720. If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to show that, "but for" the protected activity, an adverse employment action would not have been taken against him. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* ––– U.S. –––, –––, 133 S.Ct. 2517, 2534 (2013).

### 1. *A Prima Facie Case*

The Court turns first to Plaintiff's *prima facie* case, and, specifically whether Plaintiff participated in a protected activity that was known to Defendant. As an initial matter, it is beyond

dispute that Plaintiff participated in a protected activity when he submitted CHRO complaints in June 2010 and February 2011.  Defendant claims, however, that Plaintiff's July 2009 complaints to Debra Milardo do not rise to the level of protected activities.  Defendant argues that although Plaintiff's July 2009 complaints contain allegations related to Tetrault's bad behavior, neither complaint supports an objectively reasonable belief that Plaintiff was opposing *conduct proscribed by law*, such as discrimination based on race or sex.

"The term 'protected' activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores*, *Inc*., 202 F.3d 560, 566 (2d Cir. 2000).  Protected activity need not "rise to the level of a formal complaint in order to receive statutory protection." *Id*.  Rather, protected activities include "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers  who have filed formal charges." *Sumner v*. *U.S*. *Postal Serv*., 899 F.2d 203, 209 (2d Cir. 1990).

"To prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of [the law]." *Manoharan v*. *Columbia Univ*. *Coll*. *of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988); *see also Davis v*. *State University of New York*, 802 F.2d 638, 642 (2d Cir. 1986).  "However, the plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan*, 842 F.2d at 593 (internal quotation marks omitted).  General complaints that do not put the employer on notice of a claim of unlawful discrimination, do not constitute protected activity. *See Ochei v. Coler/Goldwater Mem'l Hosp*., 450 F. Supp. 2d 275, 287 (S.D.N.Y. 2006) (plaintiff "complaining about observations of her work, and other allegedly adverse actions" was not a

25

protected activity because plaintiff did "not allege that she complained . . . that she was the victim of discrimination"); *Int'l Healthcare Exch.*, *Inc. v. Global Healthcare Exch.*, *LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (complaints about having to perform secretarial work did not allege discriminatory misconduct to constitute protected activity). Although one must put the employer on notice that discrimination is occurring, an "employee is not required to use legal terms or buzzwords when opposing discrimination" in order to constitute a protected activity. *Kelley v. Sun Microsystems*, *Inc.,* 520 F. Supp. 2d 388, 403 (D. Conn. 2007) (internal quotations marks and citations omitted).

Plaintiff's July 2009 complaints concerned two separate incidents. One incident related to a sexually explicit comment Tetrault made about Debra Milardo; the other related to "abusive treatment" of Plaintiff by Tetrault on the morning of July 17, 2009 (the day after Plaintiff, Tetrault and Darley met with John Milardo). Doc. [99-6] at 2. With respect to the former, the signed complaint stated in its entirety:

> To: Mrs. Debra Milardo
>
> Two weeks ago Ricky, Burt, Tom and I, Eddie White were standing around the job site. Ricky made a comment in a jokingly manner directed at Tom Tetrault, all the guy's laugh. Mr. Tetrault then replies "I Would Look Pretty Good With [Debra Milardo's] Tit In My Mouth[.]" The reaction for Burt, Ricky and I was sheer embarrassment, I then replied to Tom that was not appropriate. Burt turned and walked away.
>
> Eddie White
> Assistan[t] Field Maintenance Manager

Doc. [99-7] at 1. Although Plaintiff's theory of discrimination is anchored primarily in his belief that he was discriminated against because of his race, he relies on this complaint to establish that he was retailed against for reporting discrimination of a fellow employee because of sex.

Title VII prohibits "discriminat[ion] . . . because of . . . sex"; however, "work place harassment" is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80, 118 (1998). "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (internal quotation mars omitted). Here, Plaintiff's complaint does not supply the inference that the remark at issue was made in the presence of a female coworker, much less contain an allegation that a female coworker was *discriminated against* in the *terms and conditions of her employment because of her sex*. Consequently, Plaintiff complained in this instance only of an inappropriate comment— not discriminatory behavior proscribed by law. The Court therefore concludes, without difficulty, that Plaintiff did *not* participate in a protected activity when he reported this remark to Debra Milardo.

With respect to the written complaint Plaintiff submitted to Debra Milardo concerning Tetrault's "abusive treatment," the signed complaint stated in its entirety:

> To: Mrs. Debra Milardo
>
> On the morning of 7/17/2009 I, Eddie White went in too [*sic*] Tom Tetrault['s] office [to] get the work assignment for the day. Immediately he started telling me that, [he] was going to write Devin and I up for every "FUCK UP" that the guy's make. He then proceeded to slam his hand on the desk and yell out "John Milardo is not going to tell me how to run my FUCK'IN department[.]" I felt he was trying to intimidate me.
>
> Eddie White
> Assistant Field Maintenance Manager

Doc. [99-7] at 2. On its face, nothing in this complaint indicates that Plaintiff was complaining of race discrimination. However, when Plaintiff submitted to Debra Milardo a written account of this

discrete incident, Debra Milardo testified that he also expressed to her his concern that he was being mistreated because of his race.  Doc. [99-4] at 58-59.  That belief accounts for why Debra Milardo investigated whether discriminatory animus motivated Tetrault's conduct, and why she stated in the zero tolerance investigation report, which she provided to Tetrault on November 3, 2009, "[*t*]*he one charge . . . that is not sustained is that of discrimination*."  Doc. [99-12] at 8, 10 (emphasis added).

The Court therefore finds that Plaintiff engaged in a protected activity known to Defendant when on July 17, 2009, he reported to Debra Milardo an account of Tetrault's abusive behavior and expressed concern that he was being mistreated because of his race.[8]  In sum, Plaintiff participated in protected activities known to Defendant when he submitted the: (1) July 2009 complaints, accompanied by his remarks to Debra Milardo which triggered her investigation into possible racial animus on Tetrault's part; (2) June 2010 CHRO complaint; and (3) February 2011 CHRO complaint. Plaintiff has therefore satisfied the first and second elements of his *prima facie* retaliation claim

With regard to the third element of Plaintiff's *prima facie* case, which requires a showing of "adverse employment action," Plaintiff claims that in addition to his demotion, he was treated adversely by being subjected to formal complaints from Russo and Tetrault in 2010 and 2011, and

---

[8]It is well settled that to meet the knowledge requirement of a *prima facie* case, only "general corporate knowledge that the plaintiff has engaged in a protected activity" is required.  *Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 2010 (2d Cir. 2006) (internal quotation marks omitted);  *Gordon v. New York City Board of Education*, 232 F.3d 111, 116 (2d Cir. 2000). The Court notes, in any event, that while Defendant knew of Plaintiff's participation in a protected activity as early as July 17, 2009, *Tetrault knew* not later than November 3, 2009, of Plaintiff's participation in a protected activity, when, on that date, Debra Milardo provided Tetrault the zero tolerance investigation report, which indicated that she investigated Plaintiff's complaint of *discrimination because of race*. Indeed, it would not be unreasonable to conclude that Tetrault was aware of Plaintiff's complaint of discrimination because of his race as early as July 17, 2009, when he learned through the "rumor mill" that Plaintiff had filed a complaint and that he was to be stripped of supervisory authority pending the outcome of the zero tolerance investigation.  Doc. [99-5] at 52.

by being assigned primary responsibility for completing the backflow testing work.  Plaintiff also contends generally that he was subjected to "constant scrutiny and complaints," given "contradictory orders," had his "authority" "undermined," was "harassed and [written] up," "censured . . . based on complaints and grievances filed by . . . Tetrault" and  accused of "'insubordination'" based on his "legitimate questions and concerns."  Doc. [99-21] at 21, 23.

Defendant concedes that Plaintiff's demotion was an adverse employment action, but argues that with respect to Plaintiff's other claims of adverse treatment, Plaintiff has "failed to alleged that he was transferred, fired . . . that his pay or . . . benefits were reduced," or that he experienced  "any injury resulting from [Defendant's] actions."  Doc. [104] at 5.  Defendant suggests that at best, the allegedly adverse actions Plaintiff identifies amount to "minor annoyances" that are "insufficient as a matter of law to be materially adverse."  *Id.* (quotation marks omitted).

For purposes of a retaliation claim, an adverse action need not be an action that affects the terms and conditions of employment, such as a hiring, firing, change in benefits, reassignment or reduction in pay.  *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. at 64.  Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (internal quotation marks omitted).  This standard "speak[s] of *material* adversity because . . . it is important to separate significant from trivial harms.  Title VII . . . does not set forth 'a general civility code for the American workplace.'"  *Id.* at 68 (emphasis in original) (quoting *Oncale v. Sundowner Offshore Servs*., *Inc*., 523 U.S. at 80).  Nevertheless, a harm that may be trivial for one, may be significant for another.  Put differently, "[c]ontext matters."  *Id.* at 69.  For example, while a "schedule change in an employee's work

schedule may make little difference to many workers," it "may matter enormously to a mother with school-age children." *Id.* And, although a "supervisor's refusal to invite an employee to lunch is normally trivial," "excluding an employee from a weekly training lunch that contributes significantly to employee's professional advancement" may amount to adverse employment action if it "deter[s] a reasonable employee from complaining about discrimination." *Id.* Further, "in determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and *in the aggregate*, as even minor acts of retaliation can be sufficiently *substantial in gross* as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (emphasis added).

Under this standard a jury could reasonably conclude that several of the actions taken by Defendant against Plaintiff would dissuade a reasonable employee from complaining about race discrimination. "[R]etaliatory work assignments," for instance, are a "classic and widely recognized example of forbidden retaliation." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. at 71 (internal quotation marks omitted). Defendant's decision to assign Plaintiff the less desirable and arduous task of backflow testing falls squarely within this category. In addition, while a score of complaints filed against Plaintiff by Russo and Tetrault in 2010 and 2011 did not result in disciplinary action, the Court finds that they nevertheless could have dissuaded a reasonable person from making a charge of discrimination when viewed as the most salient instances of a "larger campaign of harassment." *See Zelnik v. Fashion Inst. of Tech*., 464 F.3d 217, 227 (2d Cir. 2006) ("ridicule was considered a part of a larger campaign of harassment which though trivial in detail may been substantial in gross, and therefore actionable") (internal quotation marks omitted)). Russo's and Tetrault's complaints against Plaintiff (which do not appear to have been substantiated

by Defendant's personnel department) can be viewed as adverse conduct when considered alongside the assignment of backflow testing to Plaintiff, and other instances of nitpicking, heightened scrutiny, and harassment to which Plaintiff was subjected.  *Id.* at 226 (stating that a reprimand may constitute an adverse employment action).  The Court therefore concludes that the following actions directed at Plaintiff were adverse when considered separately or in the aggregate: (1) the backflow testing assignment to Plaintiff; (2) Tetrault's September 2010 and January 2011 complaints against Plaintiff; (3) Russo's June 2011 and August of 2011 complaints against Plaintiff; and (4) Plaintiff's demotion in January 2012.  Plaintiff has therefore satisfied the third element of his *prima facie* case.

The Court turns finally to the fourth element of Plaintiff's *prima facie* case, which requires a plaintiff to establish a causal connection between the protected activity and adverse employment action.  A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.  *See Clark County Sch. Dist.* v. *Breeden*, 532 U.S. 268, 273-74 (2001); *accord Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001).  Courts have "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  *Gorman-Bakos*, 252 F.3d at 554.  Thus, a court may "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the cases."  *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citing *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (three months between EEOC complaint and adverse conduct too attenuated to create causal connection) and *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (lapse of eight months between EEOC complaint and retaliatory act was sufficient to establish causal connection).  Where there are longer

31

gaps in time between protected activity and adverse employment action, the inference of causation may be inferred from the fact that the employer was waiting for the opportune time to retaliate. *See Espinal v. Goord*, 558 F.3d at 130 (finding lapse of six months sufficient to support an inference of causal connection based partly on fact that officers were waiting for opportune time to retaliate)*; Grant v. Bethlehem Steel Corp.*, 622 F.2d at 45-46 (affirming finding that eight month gap between EEOC complaint and retaliatory action suggested causal relationship because it was the first opportunity for retaliation).

As an initial matter, the Court finds that the time period between Plaintiff's demotion and his February 2011 CHRO complaint (his most recent protected activity) is too attenuated to support an inference of causation. Plaintiff's demotion in January 2012, occurred *almost a full year* after he submitted his CHRO complaint in February 2011. Not only does the passage of time preclude the inference of causation, it appears that Plaintiff's demotion was a *direct result* of his failure to obtain his state operator's license within two years of his appointment to the Assistant Field Maintenance Manager position. Doc. [90-1] at 8. It was only after the date by which Plaintiff was to acquire that license had passed, that Defendant initiated the process of Plaintiff's demotion. There is therefore no causal connection between Plaintiff's demotion and Plaintiff's participation in a protected activity.

Unlike Plaintiff's demotion, however, the Department's decision to assign Plaintiff backflow testing work, occurred almost *immediately* after he filed his July 2009 complaints against Tetrault with Debra Milardo. In fact, Defendant continued to assign Plaintiff this work even after he filed his June 2010 CHRO complaint. The Department's decision to assign Plaintiff the arduous and undesirable task of backflow testing was therefore causally connected to Plaintiff's participation in a protected activity for purposes of Plaintiff's *prima facie* case.

32

As the question relates to Tetrault's September 2010 and January 2011 complaints, the record supports an inference of causation notwithstanding the fact that roughly seven months passed between Plaintiff's June 2010 CHRO complaint and Tetrault's most recent complaint in January 2011. This inference is permitted because Tetrault resolved "get back at the people that caused him to be suspended, including [Plaintiff]." And because Tetrault's January 2011 complaint, to which was attached a copy of Plaintiff's June 2010 CHRO complaint, contained an allegation that Plaintiff had filed a "false" CHRO complaint against him.

Finally, with respect to Russo's June 2011 and August 2011 complaints, the Court notes that the most recent of those complaints also came roughly seven months after Plaintiff's February 2011 CHRO complaint. However, because Plaintiff filed his February 2011 CHRO complaint when he was on his second medical leave and did not return to work *until May 2011*, Russo did not have occasion until after that time, and when Plaintiff committed a transgression, to submit a complaint against him. Thus, viewing the facts in the light most favorable to Plaintiff, this could conceivably have been an instance where the employer was waiting for an "opportune time" to retaliate. *Espinal v. Goord*, 558 F.3d at 129. The Court therefore finds that the evidence is sufficient to sustain Plaintiff's (*de minimis*) burden of showing, as part of his *prima facie* case, a causal connection between a protected activity and adverse conduct.

Based on the foregoing, the Court concludes that Plaintiff has made out a *prima facie* claim of retaliation.

### 2.      *Non-Retaliatory Explanation*

Because Plaintiff has made out a *prima facie* case, "the burden of production shifts to [Defendant] to demonstrate that a legitimate, nondiscriminatory reason existed" for Russo and

33

Tetrault's complaints against Plaintiff, and the assignment of backflow testing work to him. *Summa v. Hofstra Univ.,* 708 F.3d at 125 (quotation marks omitted). As to the backflow testing assignment, Defendant proffers that "backflowing testing and inspection work assignments were within [Plaintiff's] job description." Doc. [104] at 6. With respect to Russo's August 2011 complaint against Plaintiff, Defendant suggests that Russo's decision to report Plaintiff for insubordination was a justified response to Plaintiff's failure to follow Russo's directive. *Id.* Finally, as the question relates to Tetrault's September 2010 and January 2011 complaints, and Russo's June 2011 complaint against Plaintiff, Defendant, perhaps because its argument focused primarily on the deficiencies in Plaintiff's *prima facie* case, does not specifically articulate a legitimate, non-discriminatory reason for those complaints. However from its general claim that it had "concerns about [Plaintiff's work performance," the Court credits Defendant as articulating that the remaining internal complaints filed by Tetrault and Russo were justified based on what Tetrault and Russo legitimately viewed as Plaintiff's performance deficiencies or insubordination. Doc. [90-1] at 2-3. Defendant has therefore met its burden of articulating legitimate, non-retaliatory explanations for the adverse employment actions against Plaintiff.

### 3. *But-For Causation*

At the final stage of the *McDonnell Douglas* standard, the burden shifts back to Plaintiff to show that "but for" his participation in the protected activities, Defendant would not have taken adverse employment action against him. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* —— U.S. ——, ——, 133 S.Ct. 2517, 2534 (2013). Therefore, in order to survive Defendant's motion for summary judgment, Plaintiff must establish that there is a genuine issue of material fact as to whether, but for his participation in protected activities, he would not have been given the backflow

testing assignment or been subjected to complaints from Tetrault and Russo.

Although Defendant claims that Plaintiff was properly given the backflow testing assignment because it was within his job description, there is a genuine issue of material fact as to whether this work assignment was to be part of Plaintiff's duties in practice. Both John Milardo and Debra Milardo expressed their view that backflow testing was to be completed by members of the Local 466 union, not Plaintiff. Doc. [99-16] at 2-6. John Milardo believed that by assigning this work to someone other than a Local 466 member, the Department was potentially "*exposing* [*itself*] *to litigation*." *Id.* at 6 (emphasis added).

There is also a material dispute on this record as to whether the assignment of backflow testing was given to Plaintiff as a means of retaliation. As early as August 2009, Debra and John Milardo expressed concern to Russo and others that Plaintiff had been assigned an unreasonable portion of the backflow testing work. Debra Milardo even expressed to Russo her concern that Plaintiff was being *retaliated against* for filing complaints against Tetrault in July 2009. Doc. [99-15] at 2; Doc. [99-16] at 3. In spite of the concerns raised by John Milardo and Debra Milardo in 2009, the Department continued over the course of the next year to assign this work to Plaintiff. In fact, when Plaintiff went on medical leave, there is evidence to suggest that the Department, contrary to its policies and procedures, did not reassign this work to another member of the workforce, but instead left Plaintiff with a back log of backflow testing to complete upon his return. Doc. [99-29] at ¶¶ 13-14. On balance, the Court concludes that there is a genuine issue of material fact as to whether Plaintiff was retaliated against when he was given the backflow testing assignment.

There is also a material dispute as to whether Russo's and Tetrault's complaints against Plaintiff were motivated by retaliation. Even taking the allegations asserted in those complaints as

true, it is unclear whether they were justified responses to Plaintiff's insubordination, as opposed to complaints against Plaintiff that would not have been submitted *but for* his participation in protected activities.  It is curious, for example, that not less than a score of formal complaints filed against Plaintiff— the first of their kind in his twenty years with the Department— came *only after* his decision to report Tetrault's misconduct in 2009.  Moreover, the fact that none of the complaints were substantiated or found to be violations of Defendant's zero tolerance policy or City of Middletown personnel rules, begs the question whether they should have been submitted in the first place and were motivated by retaliatory animus.

The personal observations of those close to the Department also creates a material issue as to whether Russo's and Tetrault's complaints were driven by retaliation.  Barone and Miano, for example, were of the opinion that Plaintiff was being harassed and discriminated against by Tetrault. Doc. [99-23] at 1; Doc. [99-24] at 1.  Kapacziewski also stated that she had observed Plaintiff "on separate occasions being discriminated against by . . .Tetrault . . . Young, and . . . Russo."  Doc. [99-25] at 1.  Similarly, John Milardo believed that it "became a race issue" when the Department began "writing up" Plaintiff for falling behind on the backflow testing assignment.  Doc. [99-3] at 88.  And Debra Milardo, who had repeatedly expressed her feeling to Russo that Plaintiff was being retaliated against, testified that Plaintiff  "was disciplined at a level, or frequency level, that gave way to question."  Doc. [99-4] at 42.  Viewing this evidence as a whole, the Court finds that Plaintiff's claims of retaliation are not appropriate for summary disposition.  They must be evaluated by a jury.

Accordingly, Defendant's motion for summary judgment dismissing Plaintiff's claims of retaliation in violation of § 1981, Title VII, and CFEPA will be denied.

**D.   Discrimination under § 1981, Title VII and CFEPA**

Finally, the Court considers Plaintiff's claim that he was discriminated because of his race in violation of § 1981, Title VII and CFEPA.  To this end, Plaintiff claims that Defendant's adverse employment actions against him "were not just retaliatory, but also acts of discrimination."  Doc. [99] at 29.

Like Plaintiff's retaliation claims, his claims of discrimination in violation of § 1981, Title VII and CFEPA, are also evaluated collectively under the *McDonnell Douglas* standard.  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) ("The substantive standards applicable to claims of employment discrimination under Title VII . . . are also generally applicable to claims of employment discrimination brought under § 1981"); *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. at 108 (applying *McDonnell Douglas* standard to CFEPA); *see also Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004).   To make out a *prima facie* case of race discrimination at the first stage of this standard, a plaintiff must show that: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  This *prima facie* case creates a presumption that the employer unlawfully discriminated against the plaintiff, and the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the employment decision at issue.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000); *see also Burdine,* 450 U.S. at 254.  If the employer does so, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer was acting with pretext.  *See Hicks,* 509 U.S. at 530; *Burdine,* 450 U.S. at 253 (citing *McDonnell,* 411 U.S. at 804).

Turning to the first and second elements of Plaintiff's *prima facie* case, it is not disputed that Plaintiff is a member of a protected class and that he was qualified for the position of Assistant Field Maintenance Manager prior to January 2012, at which time he was demoted for his failure to obtain his state operator's license. To the extent Plaintiff claims that he was *demoted* because of his race, the Court finds that Plaintiff's *prima facie* case fails on this score. He was not licensed (and thus not qualified) to be an Assistant Field Maintenance Manager and was demoted on that basis. Doc. [90-4] Ex. L; Doc. [99-3] at 65-66.

With respect to the third element of the *prima facie* case, "adverse employment action," the Court notes at the outset that its findings concerning Defendant's materially adverse actions in the context of Plaintiff's *prima facie retaliation claim* do no bear on the analysis here. In *Burlington Northern*, the Supreme Court held the standard for adverse employment actions in retaliation claims is more relaxed than the standard for discrimination claims under Title VII, which is limited only to those materially adverse actions that affect the terms and conditions of employment. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 68 (Unlike discrimination claims, "the anti-retaliation provision" of Title VII "is not limited to discriminatory actions that affect the terms and conditions of employment."); *Hicks v. Baines,* 593 F.3d 159, 165 (2d Cir.2010) ("[I]t is now clear that Title VII's anti-discrimination and anti-retaliation provisions are not coterminous; anti-retaliation protection is broader and extends beyond workplace-related or employment-related retaliatory acts and harms." (Internal quotation marks omitted)). Thus, where a plaintiff to make out a *prima facie* claim of retaliation need only show whether "the employer's action [were] harmful to the point that they could . . . dissuade a reasonable worker from making or supporting a charge of discrimination," a plaintiff sustains an adverse employment action in the context of a discrimination

38

case, only if he "endures a materially adverse change in the *terms and conditions* of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quotation marks omitted) (emphasis added).  To be materially adverse in the context of a discrimination claim, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted).  Adverse employment actions can include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Id*.

Although actionable under a theory of retaliation, none of the adverse employment actions Plaintiff alleges here (including the backflow testing assignment and complaints filed against him by Russo and Tetrault) were materially adverse changes in the terms and conditions of his employment for purpose of a discrimination claim.  Plaintiff cannot establish that he suffered an "adverse employment action" and is therefore unable to make out a *prima faci*e claim of race discrimination.

Accordingly, Defendant's motion for summary judgment dismissing Plaintiff's claim of discrimination because of his race in violation of § 1981, Title VII and CFEPA will be granted.

## III.  CONCLUSION

For the foregoing reasons, the Court disposes of the pending motions as follows:

1.  Defendant's Motion to Strike [Doc. # 103] is DENIED.

2.  Defendant's Motion for Summary Judgment [Doc. # 90] is GRANTED IN PART AND DENIED IN PART.

3.  The Motion for Summary Judgment is GRANTED as to Plaintiff's discrimination claims against Defendant.  The Motion is DENIED as to Plaintiff's hostile work environment and retaliation claims against Defendant.

4.  Counsel for the parties are directed to confer and submit a joint Amended Fed. R. Civ. P. Rule 26(f) Report on or before October 10, 2014.

IT IS SO ORDERED.

Dated:   New Haven, Connecticut
         September 9, 2014

                                        /s/ Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge